**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE, P. J., and REESE, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**December 6, 2017**

# In the Court of Appeals of Georgia

A17A1926. HENDERSON v. THE STATE.                    DO-064 C

DOYLE, Presiding Judge.

Larry Henderson was charged with four counts of aggravated assault against a peace officer.[1] Following a hearing, the trial court granted the State's motion to involuntarily medicate him in an attempt to make him competent to stand trial. Henderson appeals, arguing that the trial court failed to follow the test set forth in *Sell v. United States*[2] and that he has a statutory right under OCGA § 37-3-163 to avoid involuntary medication. For the reasons set forth below, we vacate the trial court's order and remand this case for further proceedings in light of this opinion.

---

[1] OCGA § 16-5-21 (c) (1) (A).

[2] 539 U. S. 166 (123 SCt 2174, 156 LE2d 197) (2003).

In *Sell*,[3]

> the Supreme Court of the United States established a four-part test for determining the rare instances when it is constitutionally permissible to involuntarily medicate a mentally ill criminal defendant for the sole purpose of making him competent to stand trial. . . . [T]he first part of the [*Sell*] test generally presents a legal question and thus should be reviewed de novo on appeal, while the remaining three parts present primarily factual questions and thus should be reviewed only for clear error by the trial court.[4]

So viewed, the record shows that on February 5, 2013, Henderson was charged with four counts of aggravated assault against a peace officer after he allegedly shot at four police officers, hitting one in the leg. On February 13, 2017, the State filed a motion for involuntary medication, alleging therein that: on May 10, 2013, defense counsel filed a motion for a mental evaluation; in June 2013, Dr. Deborah Gunnin found Henderson incompetent to stand trial; on July 2, 2013, Henderson filed a special plea of mental incompetency; on November 8, 2013, the trial court ordered a re-evaluation of competency; on February 4, 2014, psychiatrist Dr. Michael Vitacco

---

[3] See id.

[4] (Punctuation omitted.) *Warren v. State*, 297 Ga. 810, 812 (1) (778 SE2d 749) (2015), quoting *Sell*, 539 U. S. at 180-181.

2

completed a report, concluding that Henderson had a mental illness – schizoaffective disorder, bipolar type, which was in partial remission due to medication completion – but was competent to stand trial; on July 24, 2014, Henderson's treating physicians wrote letters to the trial court indicating that he had refused to take medication and that his mental health symptoms had significantly worsened such that he was incompetent to stand trial; on August 28, 2014, the State filed a motion for involuntary medication; on August 29, 2014, following a hearing, the trial court entered an order for involuntary medication; on September 1, 2015, the trial court held a jury trial on Henderson's plea of mental incompetency to stand trial, and the jury found him competent; on September 18, 2015, Henderson filed a special plea of not guilty by reason of insanity; on December 3, 2015, the trial court ordered a competency evaluation based on concerns raised by defense counsel; on September 22, 2016, following a second jury trial on his plea of mental incompetency, the trial court sustained Henderson's plea and ordered him returned to the Department of Behavioral Health and Developmental Disabilities ("the Department") for possible restoration to competency; and Dr. Brett Ryabik wrote to the trial court explaining that since Henderson's November 22, 2016 admission to the Forensic Unit of East Central Regional Hospital, Henderson continuously refused to take his medication or

3

to attend treatment groups, noting that Henderson would be unlikely to become competent to stand trial if he was not required to take his psychotropic medications.

Henderson opposed the motion for involuntary medication, arguing that he had a clear statutory right to refuse medication under OCGA § 37-3-163 (a) and (b).

At the May 15, 2017 *Sell* hearing, the State introduced the testimony of Dr. Ryabik and Dr. Holly Tabernik. Dr. Tabernik, a forensic psychologist who treated Henderson at East Central Regional Hospital, testified that he had been diagnosed with schizoaffective disorder and cannabis use disorder. Henderson had been involuntarily medicated since February 2017, based upon incidents of physical aggression against hospital staff, including grabbing their shirts and hitting them with doors. According to Dr. Tabernik, at the time of the hearing, the medication was "helping [Henderson's] mental status somewhat"; he was "less disorganized," but continued to have delusional beliefs that "interfere[d] with his rational ability to consult with his attorney." Dr. Tabernik opined that Henderson could not be restored to competency without taking psychotropic medications, and he has a "well-documented history of not being compliant with taking his medication."

Dr. Ryabik, Henderson's treating forensic psychiatrist, testified that Henderson had been diagnosed with schizoaffective disorder, bipolar type, meaning that he

4

suffered from depressive symptoms at times and manic symptoms with grandiose ideas at others. According to Dr. Ryabik, Henderson regularly refused his medications and "decompensated rather quickly" when he was returned to the detention center. Dr. Ryabik opined that there was no way that Henderson could be restored to competency without medications. At the time of the hearing, Henderson was being involuntarily administered three milligrams of Risperdal, an anti-psychotic medication, ten milligrams of Zyprexa, another anti-psychotic medication that is also used to treat mood symptoms, and Cogentin, intended to prophylactically mitigate the side effects of the anti-psychotics. According to Dr. Ryabik, Zyprexa and Risperdal can cause sleepiness or sedation, but Henderson had not experienced either as a result of taking them. Other side effects of "these types of medication" are tremors, stiff muscles, muscle spasms, and tardive dyskinesia – "slow, writhing, abnormal movements . . . usually around the face and mouth" – as well as weight gain and increased blood sugar, cholesterol, and lipids. Dr. Ryabik further testified that Henderson previously had been on Risperdal and Depakote, a mood stabilizer, which "overall" Ryabik thought "would be a more appropriate treatment for him."

Dr. Ryabik testified that since being on the Zyprexa and Risperdal, Henderson's appetite had increased, he was "a lot easier to engage," and his

5

aggressive behavior had decreased. Nevertheless, Dr. Ryabik explained that "to get [Henderson] good enough to be competent to stand trial, we may have to give him different medications . . . and try some different things." Dr. Ryabik did not, however, specify the "different medications," though he did agree that "medication . . . [would be] substantially unlikely to have side effects that would interfere significantly with . . . Henderson's ability to assist his lawyer in conducting a defense."

In closing argument at the hearing, defense counsel argued that an order for involuntary medication would violate *Sell* because the State had failed to identify a specific treatment plan, including the types and dosages of medications it proposed. At the conclusion of the hearing, the trial court orally granted the motion for involuntary medication.

On May 17, 2017, the trial court entered a written order, concluding therein that "[t]he State has met its burden of showing the four *Sell* factors by the 'clear and convincing evidence' standard." The Court further concluded that:

> [i]nvoluntary medication will significantly further the important State interest of timely prosecution and assuring that the [d]efendant's trial is fair. The [c]ourt finds from the testimony of Dr. Ryabik that there is a substantial likelihood of restoring the [d]efendant to competency if the [d]efendant is medicated. The [c]ourt further finds that administration of anti-psychotic medication is substantially unlikely to have side effects

6

that will interfere significantly with the [d]efendant's ability to assist counsel in conducting a trial defense. In fact, the medicine will enhance his ability to help his lawyer defend the case.

The court then ordered that Henderson

is to be medicated with anti-psychotic medication as deemed appropriate by a psychiatrist with the [Department]. . . . The [Department] is further ORDERED to report to the [c]ourt within 60 days of the next administration of the anti-psychotic medication to update the [c]ourt if there is no positive response to the medication. The [c]ourt further ORDERS the [Department] to notify the [c]ourt, the State, and . . . counsel for the [d]efendant . . . if the [d]efendant experiences serious new side effects as a result of the medication. Should such side effects be experienced, the notice shall take place as soon as possible but in no event later than [five] days from the onset of the serious side effects.

This appeal followed.

1. Henderson argues that the trial court failed to follow the four-part *Sell* test. We agree.

Under the four-part *Sell* test, the State must demonstrate: "(1) important governmental interests are at stake; (2) involuntary medication will significantly further those governmental interests; (3) involuntary medication is necessary to

7

further those governmental interests; and (4) the administration of the drugs to be used is medically appropriate for the defendant."[5]

Pretermitting whether the State has demonstrated the first and third steps, it failed to demonstrate the second and fourth steps: that involuntarily medicating Henderson will significantly further important government interests and that the administration of the medication is medically appropriate for Henderson.

> The second part of the *Sell* test requires the trial court to determine that "involuntary medication will significantly further" the governmental interests in bringing the defendant to trial. This inquiry has two components. The court must find that "administration of the drugs is substantially likely to render the defendant competent to stand trial" and, at the same time, that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair."[6]

Here, the trial court failed to specify the anti-psychotic medication or the dosages that can be forcibly administered to Henderson. And although Dr. Ryabik testified about the side effects of the medications Henderson had taken in the past and

---

[5] *Warren*, 297 Ga. at 812 (1).

[6] Id. at 828 (3) (b).

8

generally about the side effects of "different medications," he indicated that "we may have to give him different medications . . . and try some different things."

As the U. S. Supreme Court has stated, "an individual has a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs."[7] Thus, the relevant question is whether the State, "in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, [has] shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it[.]"[8] Accordingly, the Supreme Court of Georgia has held

> that the *Sell* test can be properly applied only in relation to an individualized treatment plan that specifies, at a minimum, (1) the drug or drugs the treating physicians are permitted to use on the defendant, (2) the maximum dosages that may be administered, and (3) the duration the drugs may be used before the physicians report back to the court.[9]

---

[7] *Sell*, 539 U. S. at 178 (III).

[8] Id. at 183 (III).

[9] *Warren*, 297 Ga. at 832 (3) (b). The Court further explained that "*Sell* did not condone – nor will this Court allow – trial courts to cede oversight of such a significant constitutional matter to the State, allowing its doctors to force a mentally ill criminal defendant to take whatever medications in whatever dosages and for whatever period of time they consider appropriate. . . . To approve of a treatment plan without knowing the proposed medication and dose range would give prison medical

9

Here, given the trial court's failure to specify the medication and dosages the treating physicians are permitted to administer to Henderson, "the trial court's ruling with respect to the second part of the *Sell* test was plainly insufficient."[10] And the same failure to specify the medication authorized for Henderson and its possible side effects on him is also fatal to the fourth part of the *Sell* test.[11]

"Consequently, we vacate the trial court's [order for involuntary medication] and remand the case for further proceedings consistent with this opinion, including a new *Sell* hearing if the State elects on remand to pursue its motion for involuntary medication."[12]

---

staff carte blanche to experiment with what might even be dangerous drugs or dangerously high dosages of otherwise safe drugs and would not give defense counsel and experts a meaningful ability to challenge the propriety of the proposed treatment." Id. at 831-832 (3) (b), quoting *United States v. Evans*, 404 F3d 227, 241 (4th Cir. 2005).

[10] *Warren*, 297 Ga. at 833 (3) (b). See also *Johnson v. State*, 341 Ga. App. 384, 389 (801 SE2d 82) (2017) (finding legally insufficient an order for involuntary administration of antipsychotic medication because "[t]he record contains no evidence regarding the proposed medications and dosages recommended to restore [the defendant's] competency").

[11] See *Warren*, 297 Ga. at 837-838 (3) (d).

[12] *Johnson*, 341 Ga. App. at 389. See also *Sell*, 539 U. S. at 186; *Warren*, 297 Ga. at 838 (4).

2. Based upon our holding in Division 1, we need not address Henderson's remaining enumeration of error.

*Judgment vacated and case remanded. Miller, P. J., and Reese, J., concur.*